Good morning. My name is Larry Reed. I'm here representing Mr. Peter Wright in this case. As the court is aware from our submissions in this case, Mr. Wright was arrested at 1.15 in the morning north of Las Vegas. And immediately after he was pulled over, allegedly for speeding, going 71 in a 75 mile an hour speed zone. This was at 1.15 in the morning. At 1.15 at the time when the officer was pulling Mr. Wright over, he also called a detective Yeager who was an officer who had a dog so that he could conduct the search. The communication to Officer Yeager at that time was that he had a consent to search form or anticipated that there was going to be a search. And so while the officer in this case indicated that he was stopping Mr. Wright for speeding, obviously his intent was to conduct a narcotic search because he was a part of the interdiction team. Now we've argued in our submissions that we believe that the initial stop of the officer was illegal because Mr. Wright was stopped in a 75 mile an hour zone going 71. The officer had indicated that he paced Mr. Wright because when he initially observed him, he saw he thought he was going to be speeding, but did not confirm that until after he had paced him. And so the court ruled against us with respect to those issues and determined. So if the court heard all of the evidence, heard Mr. Wright's testimony, heard the officer's testimony, and made a determination as to who was believable, how are we – how would we overturn that? On what basis would we overturn that ruling? Well, the – I mean, it's a question of law as to whether or not the arrest was illegal. And so I'd ask you to apply the facts as stated out of the officer's own mouth as to what happened at the time. The government has selected certain portions of the testimony and – Are you asking us to make a credibility determination? I'm not asking you to make a credibility determination. I'm asking you to look at the facts as stated by the officer at the time with respect to his justification for the stop. But didn't the officer testify that he clocked him going 71 in a 65 mile an hour zone? At some point he changed his testimony and said that after – He said that at least once, right? He did. Isn't that sufficient evidence upon which the magistrate could rely in finding that the arrest was – the detention was not illegal? Well, you know, that's – I guess the magistrate could rely upon the information. And let's assume for the sake of argument that the arrest or stop was legal. All right. And I'm not conceding that point. I'm arguing that it was not. But let's assume that it was legal. The detention in the case was not legal. The? Detention. The detention of Mr. Wright on the side of the road, supposedly for a traffic infraction, was illegal. The officer did nothing to investigate a traffic infraction, no speeding, no illegal lane change, no hazardous change. What he did was to immediately call Officer Yeager. Now, the government in this brief, and evidently the magistrate made the determination that Mr. – that it took 30 minutes, or strike that, 15 minutes before the officer learned that Mr. Wright was clear. Well, that's totally incorrect. If you look at the – Like air fresheners and things like that. There were things that were in the car that he said caused him to be suspicious, which things – which are things in and of themselves that are not suspicious. And we also argue that he was illegally in the car at the time when he observed the items. But the point I want to make is this. Why was he illegally in the car? Didn't he ask the man to roll the window down? He asked the man to roll the window down. He got out of the car. Roll the window down. And the officer, I can't remember his name, Moonen, then said that he smells strong deodorants. Air fresheners. Air fresheners. In his – and he testified as an expert that in his training, the presence of deodorants is common among persons who are transporting drugs to hide the smell of the drugs. Right? Yeah, he said that. Well, isn't that – doesn't that show that he's investigating with some reasonable suspicion? No, not when you consider the timeline. First, what I'm trying to point out is this. If the officer tried to suggest that he had Mr. Wright on the side of the road for 15 minutes while he was waiting for information to come back regarding his driver's license status, the suggestion is that that was an innocent period of time within which the officer could carry on casual conversation. And if in the course of that casual conversation he developed information that led him to be suspicious, that therefore it was legal. And what I'm suggesting to you, and I'm telling you that the evidence that was introduced at the time of this proceeding before the referee, the magistrate, and it says – my appendix, page 4, 5, and 6, that information shows that the officer had learned almost immediately that Mr. Wright did not have any kind of criminal record, that there was no violation, no charges on him. And so he did nothing at that point to conduct a traffic investigation but then kept Mr. Wright out of the car while he then goes through the car rummaging to try to develop something to justify a later search. What is your legal argument here? Is it your strongest legal argument? My strongest legal argument – I'm sorry. Go ahead. Is that the detention exceeded the scope – strike that. That the detention was not related to the basis for the initial stop. In other words, he was stopped for speeding. He was detained even after the officer had – and he was detained beyond the time necessary to complete whatever the officer had to do with the traffic stop. If he's stopping him from speeding, give him a speeding ticket and let him go. You don't stop him and find out that he's clear, and then instead of letting him go, then to go on and – Well, what is the case on which you rely for that proposition? Because my understanding is that the Supreme Court has said that while you're doing records checks and other things after a stop, you can ask questions. I'm not saying that the officer cannot ask questions. That's why I'm trying to make sure I'm clear about what my argument is. I don't think I'm doing it at this point. What I'm suggesting is that the officer can only detain a person long enough to conduct the investigation related to the initial detention. And some of your decisions, I believe – Your point that once he smells the deodorants and he sees that the man has shaky hands and he sees that there's only one key with no key ring, no other keys, those things which he testifies in his own background and expertise leads him to believe that this man may be carrying drugs. He's got to stop. He can't investigate that by asking questions? Well, the assumption in that question is that he learned that information during the period of legitimate detention. He learned about the smell when the window came down. That's correct. He certainly couldn't open the door and look at it. And he saw the shaky hand when he got the driver's license and the registration. And he saw that there was only one key in the ignition. No, he didn't see that, because it's impossible for him to have seen that without going around looking at the car. That's an issue of fact. He testified he saw it. You say it's impossible. That was litigated and found against your client. But he saw that all at the time and he stopped him. So I still don't know. Following up on what Judge Schroeder asked you, what's the legal point that you're trying to thrust upon this? The legal point is that an officer must initially restrict his questions during the stop and the detentions to the facts that justify the stop in the first place. And if he's stopping him for speeding simply because he smells an air freshener or sees a key, that's not a sufficient basis for extending a detention. Okay. I think you're arguing there's no basis for any suspicion. And if you want to say something, we've given you almost as much time as we give the Exxon Valdez. Well, that's just one aspect of the case. We've talked about ñ I mean, I've raised other issues in my briefs as well. And in particular, the issues related to the failure to provide discovery prior to trial with respect to the handwriting expert. This obviously was a case where the testimony of the expert was critical and I needed to know that information in advance of trial and it was not provided. The suggestion from the government is that it was provided, but the name of this Mr. Gunther, who supposedly corroborated the testimony of Ms. Macio, was never produced. But even before we get to that, the information was not provided. I've submitted all that argument in my brief. The big problem at the time of trial was that Ms. Macio was allowed to manufacture a fingerprint. Ms. Macio and the government submitted the examples of the PowerPoint display in its addendum. But Ms. Macio was allowed to simply draw in a fingerprint where none existed to the prejudice of Mr. Wright. In addition, she was allowed to testify that this Mr. Gunther had corroborated her testimony, information that was not known to us in advance of trial. The court allowed her to come in and it was hearsay and it was prejudicial. So I would submit that the court committed error in allowing the PowerPoint display to be displayed and to allow the jury to receive that evidence where there was no foundation, it was extremely prejudicial, and denied Mr. Wright a fair trial. And then finally, I've argued that with respect to Agent Krautheimer, if I'm pronouncing his name correctly, the police expert, he should not have been allowed to testify because this was not a conspiracy case. Thank you. Good morning. May it please the Court. Good morning, Counsel. Elizabeth Olson for the United States. On the suppression issue, I guess the key thing that I want to just remind the Court, and I know that you know this, is that on appellate review, this Court reviews the district court's factual findings for clear error. The district court, the magistrate held a hearing at which both Officer Moonen or Trooper Moonen and the defendant testified issued a ten-page findings of facts and recommendation. The district court heard argument on the objections to the magistrate's report and issued a 23-page order denying the motion to suppress in which it made extensive factual findings. That's on the appellant's excerpt of record at pages 47 through 69. Many of the factual issues that the defendant raises in his opening brief and has made here, the district court simply flatly rejected. And in particular, the magistrate judge, in his report and recommendation, which is on pages 38 through 46 of the appellant's excerpt of record, repeatedly made statements like, I mean, he made a credibility determination where he said the court finds much of the defendant's testimony inherently unworthy of belief. He called it fanciful. He called it largely incredible. And said that in the credibility fight between the defendant and the trooper, the court easily finds that the trooper wins that fight. So many of the factual things about what happened and the timing in which it happened, you know, these are factual determinations that the district court has made. Sotomayor, with respect to the fingerprint testimony, there was evidence that someone verified the report. Who was that person? The testimony. Ms. Macio testified. She was asked whether her analysis goes through a review process, and she said yes. And then she was asked if there's a disagreement between the reviewer and the analyst what happens just in general. She said then it goes to a supervisor. And then she was asked, in your case, did it go to a supervisor, and she said no. Now, in response to one of the government's questions, she sort of unprompted said she mentioned Mr. Gunther. Ed Gunther verified her findings. Curiously, the question, did someone review your findings, there was an objection to that question saying that it called for hearsay. And the government said no, it's a yes or no question. It doesn't call for hearsay. But it does call for hearsay. Well, factually, it may or may not. I mean, if, if, I'm not sure. It may or may not. If someone reviewed your report, it means someone has formed an opinion as to your report or has read your report. It's either irrelevant or it's hearsay, because you're bringing in the declaration of someone who is not to be cross-examined to give credibility to the report. Two things. Are we to adopt a rule in this circuit that if questions can be answered yes or no, they're not hearsay? No, I think. I don't think so. No, no. Just two things I'd like to say in response to that. One is the question was did someone review your report, not did someone verify your reports, right? So. Of what relevance is that? Of course, there was an objection on relevance. Right. Minimal. It was a hearsay objection. And in any event, I think it's important to look at what happened after that. After that, there was a, after, later on in that hearing, the defense said, wait a second, we never got this reviewer's report. There's a discovery violation here because we should have gotten a copy of this report. The government spoke with Ms. Macio, the analyst, and then came back and said, no, Your Honor, the technical reviewer doesn't do a separate report. The technical reviewer signs off on the latent, on the analyst's sheet. There's a place where the reviewer signs. And we showed the judge, and that's an excerpt of record, supplemental, the government's supplemental excerpt of record at 218 to 221, where we showed the judge the copy of the latent technical review sheet, which identified Mr. Gunther by name and by ID number with the bait stamp number that had been turned over to the defense in discovery. Now, that was not admitted into evidence, but there was a discussion about this. And the district court said, well, is Mr. Gunther available? Is he local here? And we said, yes, Your Honor, he's local. You know, he can be made available. And the judge said, okay, here's what I want to do. And then defense counsel interjected and said, Your Honor, if I could just get this gentleman's phone number, I can call him and try to work it out myself. And so the court said, okay, fine. The issue never came up again. I mean, so at this point, the district court was attempting, I mean, he was you can read that where he's attempting to say here's what we're going to do. Defense counsel short-circuited that. Whatever the district court's resolution might have been, I mean, maybe the district court was going to say the government has to bring him in. Maybe he was going to say, you know, it's just not that big of a deal. It was one sentence. You know, the defense, the government's fingerprint analyst went through. Well, it may have been a very good strategy to try not to have this fellow brought in. Certainly. Yes. Yes. It certainly could be. But the fact of the matter is, and this was one misstatement of fact in the defendant's opening brief, there was never anything introduced to the jury that had this gentleman's signature on it. There was one. His name was referenced once in front of the jury, unprompted, but so be it. He short-circuited the district court's attempted resolution of this, and the fact of the matter is our fingerprint analyst gave a detailed testimony where she had the fingerprint from the drugs and the fingerprint taken from the defendant and sort of highlighted ridge by ridge showing the jury how she made this analysis. Now, this was a PowerPoint presentation, which sort of saves time and makes it easier for the jury to use, but I included a copy of that in the government's. In essence, are you saying that if there was a hearsay violation, because this the inference is that someone approved this. Yes. Right. And if there was a hearsay violation, it was cured, any violation was cured by the offer to bring in the witness. Yes. Yes. Cured or alternatively harmless beyond any doubt. Yes. Or harmless.  Unless the Court has any other questions. Thank you. Thank you. May I just note briefly that there was no offer to bring in Mr. Gunther. It was not unprompted. It was an intentional effort to convey to this jury the impression that there had been two people to review these fingerprints, and both of them had come up with the same conclusion. That's why we made the objection. But he could have been brought in and been cross-examined, right? I wouldn't have been brought in. And what happened? We couldn't find him. No answer to the phone. No answer to the phone. At that point, the objection, the damage had already been done. The damage had already been done. Is that in his record, that you couldn't find him? I'm not sure if it is. Well, I thought the government had the obligation to produce him if you requested it. The government, that's been my understanding, too, with respect to all aspects of the case, including all of the fingerprint evidence. But the government acted as if it was my responsibility to do it. When I asked for a copy of the opinions, they or a copy of the set of fingerprints, they indicated that the Las Vegas Police Department had it, and they will try to help me get it. Eventually, when I brought a motion, they agreed to provide the information. But they didn't. I never heard of Gunther until the time of trial. The information that I got is in my appendix indicating the information that I got from them. Mr. Reed, was there a motion made to strike Ms. Macio's testimony regarding the fingerprints because of the unavailability of Gunther to be cross-examined? I'm not sure if I made that motion. I do believe I brought a motion to strike the testimony, and also to preclude her from testifying at all, especially with respect to the manufactured fingerprints. Thank you. Okay. Thank you. The case is argued as to be a decision.
judges: Schroeder, Rawlinson, Bea